MORRIS PICKERING & PETERSON
Steve Morris, No. 1543
Akke Levin, No. 9102
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone:  (702) 474-9400
Facsimile:  (702) 474-9422

Attorneys for Defendants
Krystle Towers, LLC and
Turnberry/Las Vegas
Boulevard, L.P.

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| Michael Napolitano; Emmanuel Kanterakis; Mario Eracleous; Emmanuel Kavrakis; Constantine Vases; Kyriacos Trantides;<br><br>Plaintiffs,<br><br>v.<br><br>KRYSTLE TOWERS, LLC, a Nevada Limited Liability Company f/k/a KRYSTLE SANDS, LLC; TURNBERRY/LAS VEGAS BOULEVARD, L.P., a Nevada Limited Partnership; F.W. "Freddie" Schinz, an individual; FIDELITY NATIONAL TITLE AGENCY OF NEVADA, INC., a Nevada Corporation; DOES I-X; and ROE CORPORATIONS I-X,<br><br>Defendants. | CASE NO: CV-S-05-0829-KJD-PAL<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT OF DEFENDANTS KRYSTLE TOWERS LLC AND TURNBERRY/LAS VEGAS BOULEVARD, L.P.** |

Defendants Krystle Towers, LLC ("Krystle Towers") and

Turnberry/Las Vegas Boulevard, L.P. ("Turnberry"), hereby submit their reply

in support of their motion to dismiss or, in the alternative, for summary

MORRIS PICKERING & PETERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

1  judgment.  The reply is based on the pleadings on file, the declaration of F.W.

2  "Freddie" Schinz, and the points and authorities that follow.

3  **I.    INTRODUCTION**

4          Plaintiffs' turgid opposition falls short of creating a genuine issue of

5  material fact to defeat summary judgment.  It also falls short of presenting a

6  genuine legal issue that depends on discovery to decide.  Putting aside the mass

7  of irrelevant and inadmissible speculative and hearsay statements tendered as

8  "evidence" under Rule 56(e) the plaintiffs cannot and do not dispute that:

9          (1)  Krystle Towers began marketing condominium units in the Project in

10  March 2004.

11          (2)  By September 2004, Krystle Towers had 431 non-binding reservations.

12          (3)  Both Krystle Towers and its sales broker, ReMax, expected that the 431

13  reservations would be converted into Purchase Agreements (also referred to

14  herein as "Condo Agreements" and the "PSA").

15          (4)  Only 170 reservations were converted into Condo Agreements after

16  they became available in November 2004.

17          (5)  By March 2005 only a total of 223 Condo Agreements had been sold.

18          (6)  The Condo Agreement signed by every plaintiff here and in the 29

19  other cases filed by their attorneys contains an express term giving Krystle

20  Towers the absolute, unqualified right to terminate the Agreement if Krystle

21  Towers does not "enter into binding contracts to sell at least the number of units

22  required to satisfy the lender's presale requirement."

23          (7)  Krystle Towers had an exclusive construction lending agreement with

24  Hypo Bank, which required sales in the minimum amount of $229,500,000 as a

25  condition to funding construction.  When Krystle Towers made the decision to

26  terminate the Project, **223** condominium units had been sold, which left Krystle

27  Towers **$100 million** short of the $229 million in sales required to meet Hypo

28

RAN PICKERING & PEHERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

1  Bank's terms for funding construction.

2      (8) The Condo Agreement stipulates that the buyers' remedy for failure of

3  the Project is limited to the return of their deposits in the event Krystle Towers

4  elected to terminate the Agreement.

5      (9) Every buyer was reimbursed every cent of his/her/its deposit.

6      (10) Krystle Towers did not have a contractual obligation to the plaintiffs

7  to:

8          (a) Pursue financing of the Project with other lenders if pre-sales

9  failed to meet Hypo Bank's requirements.

10          (b) Negotiate less onerous pre-sales requirements with Hypo Bank

11  and hope for the best.

12          (c) Continue sales efforts beyond March 2005, when the Project was

13  cancelled.[1]

14          The plaintiffs' case is not constructed on the undisputed facts; it

15  rests on the "covenant of good faith and fair dealing," ( the Covenant) which has

16  a nice ring to it but, in this express contract case, lacks substance.  The plaintiffs

17  cannot invoke the Covenant to add a term to the PSA (*e.g.*, Kystle Towers was

18  obligated to seek financing from others if Hypo Bank's requirements for funding

19  were not met) *or* to contradict a term to which they assented — that the Project

20

21          [1] The Affidavit of Kristi Camandona illustrates the length to which

22  plaintiffs will go to fabricate a claim and tender belief as fact.  For example, she
    opines that additional units in the Project "could have been sold within five (5)

23  months of cancellation" of the Project, that the time required for additional sales

24  could have been "likely" shortened if Krystle Towers had undertaken marketing
    activities that were the separate contractual responsibility of ReMax Benchmark

25  Realty, Ms. Camandona's employer, Affidavit at 5, ¶17.  This is not only

26  inadmissible speculation, it is legally irrelevant.  The PSA in issue here does not
    stipulate what efforts, if any, Krystle Towers should have undertaken to market

27  the Project in accordance with what Ms. Camandona thought best.

28

could be terminated if construction funding was not obtained.  In either event, if Krystle Towers breached its contract, but refunded the plaintiffs' money, they would have *no claim for damages* against the defendants.  The covenant of good faith and fair dealing does not apply to the PSA's which have been fully executed by both parties, the Seller and the Buyer.

## II.   ARGUMENT

### A.   *Summary Judgment May Be Entered Without Discovery If There Is No Genuine Issue of Material Fact to Discover.*

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  So if the party bearing the burden of proof at trial fails to make a showing sufficient to establish the existence of an element essential to his case, Rule 56 mandates granting a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323; *Hocking v. Dubois*, 885 F.2d 1449, 1454 (9th Cir. 1989) (defendant may move for summary judgment by simply pointing out the absence of facts to support the plaintiff's claim); *see also Doe By and Through Knackert v. Estes*, 926 F. Supp. 979, 984 (D. Nev. 1996) (if there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial).   The party opposing summary judgment must tender *admissible* evidence "that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52, (1986).  State law is the same: The "opposing party is not entitled to have the motion for summary judgment denied on the mere hope that at trial he will be able to discredit movant's evidence." *Hickman v. Meadow Wood Reno*, 96 Nev. 782, 784, 617 P.2d 871, 872 (1980).

CRISTPICKERING & PETERSON
ATTORNEYS AT LAW
BANK OF AMER CA PLAZA
SOUTH FOURTH STREET
LAS VEGAS  NEVADA 89101
702/474 9400
FAX 702/474 9422

1       The irrelevant arguments and irrelevant facts (*e.g.*, Camandona

2 affidavit that she worked hard to sell the Project) does not alter or diminish the

3 undisputed facts and their legal significance.   If Krystle Towers performed its

4 contract with the plaintiffs, summary judgment *must* be entered against them.

5 Fed. R. Civ. P. 56(c).  Nothing in Rule 56(c) requires discovery prior to granting

6 summary judgment to interdict dismissal of their frivolous lawsuit, nor have

7 they tendered a proper request for discovery under FRCP 56(f) to oppose

8 summary judgment.  Summary judgment is not a "disfavored procedural

9 shortcut, but an integral part of the Federal Rules as a whole, which are

10 designed to secure the just, speedy and inexpensive determination of every

11 action").  *Celotex*, 477 U.S. at 327.  If the material facts are not in dispute, this case

12 should not consume any more judicial resources and parties' money than it has.

13 Summary judgment should be entered now.  *Forest v. Vitek*, 884 F.Supp. 378, 380

14 (D. Nev. 1993) ("Factual disputes which are irrelevant or unnecessary"— *e.g.*,

15 should Krystle Towers have furnished a model and/or "virtual tour" — will not

16 prevent judgment as a matter of law).

17     **B.**    ***Krystle Towers's Failure to Meet Presale Requirements Imposed by***
             ***its Lender Allowed It To Cancel the Project and Return Plaintiffs'***
18              ***Money to Them Without Further Liability.***

19       A stipulated right to terminate a contract to construct condominium

20 units if pre-sales of units do not meet financing requirements are "common in

21 business contracts." *Jackson Hole Builders v. Piros*, 654 P.2d 120, 122 (Wyo. 1982).

22 Exercise of the right to cancel is enforceable.  *Id*., at 122-23.  A termination clause

23 for the seller does not depend on the buyer having the same right.  *Laclede Gas*

24 *Company v. Amoco Oil Company*, 522 F.2d 33, 36 (8th Cir. 1975) (there is no

25 requirement of mutuality of obligation); *Piros*, 654 P.2d at 123.

26       Plaintiffs do not dispute that Krystle Towers's duty to close and

27 convey by deed to them a condominium would not arise unless pre-sales of more

28

GORDON PICKERING & ROBERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

than $229,500,000 were achieved, which did not happen. Schinz Decl., ¶¶ 7-9; Camandona Aff., ¶ 9.  The obligation to close — to convey a unit — did not arise.  Krystle Towers had a contract-based legal right to terminate the Condo Agreement and refund plaintiffs' money.  It is therefore of no legal significance that, as plaintiffs argue, their own performance was not conditioned upon obtaining financing, that the termination clause failed to name Hypo Bank, or that the Condo Agreement did not set forth the details of the pre-sales financing requirement, *see Piros*, 654 P.2d 121-122; *Restatement (Second) of Contracts* § 79 (1981) (No need for 'mutuality of obligation' under bilateral contract executed with consideration).[2]  Plaintiffs do not have and cannot plead a breach of contract claim.

C.   **The Covenant of Good Faith and Fair Dealing Does Not Permit the Plaintiffs or the Court to Re-write the Contract Between Plaintiffs and Krystle Towers.**

The Covenant is not a separate obligation that exists "in the air," but "attaches only to the performance of a specific contractual obligation." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1314 (11th Cir. 1998).  The Covenant does not impose duties on the contracting parties to which they did not agree, nor can the Covenant be invoked to contradict the express terms of the contract to which it applies.  *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 779 (9th Cir. 2003); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995); *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr.2d 267, 276-77 (Cal. App. 1 Dist. 2002) (whether the Covenant contradicts the express terms of the agreement is a question of law).  The Covenant must comport with

---

[2] *See* Opp'n, pp, 2, 14-17.  Plaintiffs do not claim that Hypo Bank's pre-sale requirements are unreasonable. They only claim that Krystle Towers should have incorporated all the details of the pre-sale requirements, including the name of Hypo Bank, in the clause.

BROST KERKING & PETERSEN
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

the intent of the parties; it "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract," *Canpartners Investments IV, LLC v. Alliance Gaming Corp.*, 981 F. Supp. 820, 824 (S.D.N.Y. 1997), and does not "prohibit a party from doing that which is expressly permitted by an agreement." *Storek & Storek*, 122 Cal.Rptr.2d at 277.

*Storek & Storek* is similar to this case; it involved "a failed real estate project," which prompted the "disappointed investors" to sue "the lender who had refused to continue financing the project." *Id.* at 270.  The obligation of the construction lender was subject to a number of conditions precedent. *Id.* at 271-272.  The Court of Appeal agreed with the lender that, as a matter of law, there could be no breach of the implied Covenant when the "offending conduct — withholding loan disbursements — was expressly authorized by the terms of the contract." *Id.* at 276, 278.

          1.    *The Condo Agreement Expressly Authorized Krystle Towers to Terminate the Agreement for Insufficient Sales.*

Krystle Towers made good faith efforts to sell the Project for a year, starting in March 2004. *See* Schinz Decl., Exh. A, ¶ 2.[3]  The plaintiffs say that Krystle did not make enough efforts, but it hired ReMax Benchmark Realty ("ReMax") to advertise and market the Project.   It negotiated a contract with

---

[3] Plaintiffs repeatedly make the deceptive suggestion to the Court that Krystle Towers abandoned the Project after a mere 2 ½ weeks. *See* Opp'n., pp. 6, 13-14, 18. These suggestions are refuted by plaintiffs' own witness. *See* Camandona Aff., ¶ 4 ( stating that ReMax took its first reservations in March, 2004).

KRISTENSEN WEISBERG & PETERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-0400
FAX 702 474-0404

1    Hypo Bank to obtain construction funds. *See id.*, ¶¶ 2-3.[4]    The 431 units were

2    reserved under ReMax's watch, without a virtual tour or model unit. *Id.*, ¶ 4.

3                    Krystle Towers was not required to pursue sales to infinity or to any

4    point in time before deciding to cancel the Project and refund the plaintiffs'

5    deposits.  Its obligations are stated in an unambiguous valid contract, which the

6    plaintiffs accepted by signing the contract.  Condo Agreement, Exhibit C to

7    Motion to Dismiss.  Section 20 of the Condo Agreement gave Krystle Towers the

8    unqualified right to terminate the Agreement if it did not sell enough units to

9    meet the pre-sales requirements of its lender, which the plaintiffs do not dispute.

10   The contract remedy for the buyers/plaintiffs prior to construction starting is the

11   return of their deposits, which they have received.  Krystle Towers has been

12   discharged.

13           2.    *The "Obligations" The Plaintiffs Ask The Court To Impose on*
                   *Krystle Towers Are Not Found In Their Contract.*
14

15           In the 15 pages of argument on the Covenant, the plaintiffs ask the

16   Court to rewrite terms of the Condo Agreement by "implying" a number of

17   obligations that contradict Krystle Towers's express right to terminate the

18   Agreement.[5]  The Condo Agreement does not address and thus does not impose

19   an obligation on Krystle Towers (a) to seek a lender to replace Hypo Bank; (b) to

20   renegotiate the pre-sales requirement with Hypo Bank; or (c) to pursue sales for

21
22           [4]  Krystle Towers spent approximately $1,498,429.59 in real estate
     commissions on ReMax. Schinz Decl., ¶ 9.  The purpose is of Kristi Camandona's
23   affidavit detailing the costs ReMax incurred in marketing the Project is not clear,
     unless it is to show that ReMax failed to sell sufficient units to make the Project a
24   success. Camandona Aff., ¶¶ 14-16.  And the exclusive listing agreement
     between Krystle Towers and ReMax ("Listing Agreement") expressly provided
25   that the "Broker will bear the costs of providing onsite sales facilities, advertising
     and other marketing expenses." *See* Listing Agreement, Exh. A, Tab 1.
26
27           [5] *See generally* Opp'n, pp. 5-21.
28

KUMMER KABE NAGELBERG...
ATTORNEYS AT LAW
... BANK OF AMERICA PLAZA
... SOUTH FOURTH STREET
... VEGAS, NEVADA 89101
702/484-9400
FAX 702/484-9432

                                    Page 8 of 17

a specific number of months, as suggested by plaintiffs.    Nor does the termination clause of the Condo Agreement require a formal "rejection" by Hypo Bank. *See* Condo Agreement, section 20.    The Covenant plaintiffs invoke as the basis for their complaint cannot be used to impose obligations on Krystle Towers that were neither negotiated nor consented to — or stated!  *Storek & Storek*, 122 Cal.Rptr.2d at 277.

> 3.    *The Covenant Cannot Be Invoked To Establish A Contract After the Fact.*

Breach of the Covenant cannot be established by a "hindsight test." *See Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F. Supp. 911, 918 (C.D. Cal.1994) (whether insurer acted in good faith "must be measured as of the time it was confronted with the factual situation to which it was called upon to respond"); *cf. In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 988 (9th Cir. 1999) (allegations for fraud claim "appeared to have been cobbled together in hindsight").  Thus plaintiffs' contentions that Krystle Towers breached the Covenant because it *should have* prepared the PSAs sooner, that $100 million sales *could have* been made in the five months following termination, and that virtual tours *should have* been used as a sales tool, Opp'n, pp. 13-14, 17-18, are "coulda-woulda-shoulda" arguments that have no legal significance and do not bear on the question whether a party has acted in good faith under an express contract.

The case law cited by plaintiffs respecting a buyer's obligation to make reasonable efforts to get financing, Opp'n, pp. 5-7, is equally irrelevant: Krystle Towers *did* have a lender, Hypo Bank, under a Loan Agreement that was executed after the developer sought financing elsewhere. Schinz Decl., and Tab 2

thereto.[6]  The issue of Krystle Towers's good faith efforts to obtain construction

from a source other than Hypo Bank is thus a non-issue that is not made

otherwise by saying Krystle Towers should have done something else.

          4.     *Plaintiffs' Hyperbole Does Not Create Genuine Issues of Material Fact.*

      The only material issue in this case is a non-issue — whether Krystle

Towers satisfied the pre-sales requirement by Hypo Bank to obtain construction

financing.  It did not.  *See* Schinz Decl., ¶¶ 7-8; Camandona Aff. ¶¶ 9, 17.[7]  There

is no need for discovery on (1) the pre-sales requirement; it is known; (2) the

name of the lender; it is known; or (3) the meaning of section 20 of the Condo

Agreement; the Court can read the contract.[8]  All this information is contained in

the Conditional Loan Agreement with Hypo Bank, which plaintiffs have, and

which Krystle Towers attaches here for the second time. Schinz Decl., Tab 2.

**D.    Unjust Enrichment Is Not Recoverable Under An Express Contract.**

      A quasi-contract claim for unjust enrichment is defeated by an

express contract.  *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151,

---

[6] Although the construction loan agreement with Hypo Bank was conditional, it contained a binding exclusivity term that prohibited Krystle Towers from dealing with other lenders until construction was funded or the *lender* (Hypo Bank) decided not to go through with the Project. Schinz Decl., ¶ 3 and Tab 2, pp. 12-13.

[7] Plaintiffs' allegation that Krystle Towers "lied" to Hypo Bank on the number of reservations converted to sales is based on incompetent hearsay statements in Ms. Camandona's affidavit. *See* Camandona Aff., ¶ 19.  Such statements are inadmissible to defeat a motion for summary judgment. Fed. R. Civ. P. 56(e).  Even assuming Krystle Towers had misrepresented the amount of sales, which it did not, *see* Schinz Decl., ¶ 8, it is of no relevance to the issue of whether or not the pre-sale requirements of the lender were met.

[8] *See* Opp'n, pp. 7-9.

KRSTK KERING & PETERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

1  1167 (9th Cir. 1996); *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d

2  401, 408-09 (9th Cir. 1992); *see also Chrysler Capital Corp. v. Century Power Corp.*, 778

3  F.Supp. 1260, 1272 (S.D.N.Y. 1991) ("the existence of a valid and enforceable

4  written contract governing a particular subject matter ordinarily precludes

5  recovery in quasi-contract for events arising out of the subject matter"); *Swanson*

6  *v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975) (action under theory of implied contract

7  precluded by existence of express contract on the subject).

8           Plaintiffs do not address this point, nor have they alleged facts to

9  establish the elements of their unjust enrichment claim, as they were required to

10 do. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir.  1987)(summary judgment

11 appropriate for failure to allege "specific facts" sufficient to establish the

12 existence of a prima facie case).  Plaintiffs give themselves a little too much

13 credit when they allege they "conferred a $70 million benefit on defendants"

14 after having received their money back under the contract. Opp'n, p. 23.

15 Assuming *arguendo* that Krystle Towers had retained their deposits, there is no

16 connection between this benefit and Krystle Towers's alleged enrichment: The

17 alleged $70 million profit neither belongs to plaintiffs, "nor conferred upon them

18 a loss. " *See Coury v. Robison*, 115 Nev. 84, 90, 976 P.2d 518, 521 (1999) (mere fact

19 that city granted defendant a license to operate gaming machines does not

20 entitle city to profits made under such license).

21 **E.      *Plaintiffs' Shot-in-the-dark-hoping-something-sticks Fraud Claim***

22 ***is Unintelligible and Fatally Infirm, As a Matter of Law.***

23           The rationale of Rule 9(b) is to provide defendants with notice of the

24 *particular* misconduct plaintiffs say constitutes the fraud charged so the

25 defendants can properly defend themselves. *Neubronner v. Milken*, 6 F.3d 666,

26 671 (9th Cir. 1993)(emphasis added); *Schreiber Distributing Co. v. Serv-Well*

27 *Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *Brown v. Kellar*, 97 Nev. 582,

28

J. ...RKIN PICKERING & PETERSON
   ATTORNEYS AT LAW
   ... BANK OF AMERICA PLAZA
   ... SOUTH FOURTH STREET
   LAS VEGAS, NEVADA 89101
   ... 474-9400
   FAX ... 474-9422

Page 11 of  17

583-84, 636 P.2d 874, 874 (1981). Plaintiffs must assert facts to support each element of their claim, *Yartzoff*, 809 F.2d at 1374, the essential element being a false representation. *Nevada Power Co. v. Monsanto Co.*, 891 F.Supp. 1406, 1413 (D. Nev. 1995). Alleging that Krystle Towers breached the Covenant and tendering Ms. Camandona's belief that had defendants just "kept going" for a few more months does not charge them with fraud for throwing in the towel in March 2005.

Plaintiffs' allegations that "[d]uring the time period prior to March 23, 2005," Krystle Towers "misrepresented" to Plaintiffs *collectively* that Krystle was "developing Krystle Sands Condominium project in good faith," Compl., 43-44 (emphasis added), is too vague to satisfy Rule 9(b). Their "back-up" allegation, that the termination letter falsely misrepresented that Krystle Towers could not get construction financing for the Project, Opp'n., p. 24, is not only a *non sequitur*, it is conclusively rebutted by *evidence* to the contrary, *and* plaintiffs' own sworn testimony. Schinz Decl., ¶¶ 7-9, and Tab 2; Camandona Aff. ¶¶ 9, 12-13 (blaming the disappointing sales on the lack of a number of marketing tools for which ReMax was responsible by *contract*). Thus a loan Krystle Towers obtained from a lender other than Hypo Bank post-termination for a non-condominium project that followed the Project on the site of Krystle Towers is of no legal importance.

### F.   *Krystle Towers Did NOT Engage in Deceptive Trade Practices.*

Plaintiffs concede NRS 598.0915 does not apply to sales, leases or advertisements of real property, such as condominiums. Opp'n, p. 25. They say their claim for "deception" is alive because the Agreement included personal property items, such as coffee tables and the like. *See id*. That may have been a claim if Krystle Towers had closed and conveyed title to the condominium units to plaintiffs *and* failed to include identifiable personalty in the conveyance, but

...KIN PICKERING & PETERSON
ATTORNEYS AT LAW
... BANK OF AMERICA PLAZA
... SOUTH FOURTH STREET
... LAS VEGAS, NEVADA 89101
702/474-0410
FAX 702/474-0420

closing did not occur.  Defendants did not promise to deliver, or misrepresent what they would deliver.  There is no deceptive trade practices claim on these "facts."

### G.    Personal Property That Does Not Exist Cannot Be "Converted".

A future right to receive personal property will not support a present claim for conversion of the property.  Plaintiffs must but have not established that  (1) Krystle Towers tortiously exercised control over personal property belonging to them; and that (2) they had an immediate right to possession of the property, which defendants thwarted, thus "converting" the property.  *See Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000) *Spates v. Dameron Hosp. Assn.*, 7 Cal. Rptr.3d 597, 608 (Cal. App. 3 Dist. 2003); *Sydney v. Coca-Cola Co.*, 569 S.W.2d 11, 14 (Mo.App.1978); *Kruger v. Horton*, 725 P.2d 417, 421 (Wash. 1986) (plaintiff must prove a right to possess the property converted).   A mere equitable interest in property will not support a conversion claim against the defendants.  *Shipley v. Meadowbrook Club, Inc.*, 126 A.2d 288, 293 (Md. 1956); *Coca Cola Co.*, 569 S.W.2d at 14.

Plaintiffs' claim for conversion is frivolous and should be discarded.

### H.    The Plaintiffs Do Not Have, Nor Did They Ever Have, A Contract Right To Ownership of Real Property That Would Support Specific Performance.

The plaintiffs must have a legal or an equitable right to ownership of real estate for the Court to decree specific performance.  They have neither.  Legal title to real estate only passes when all conditions of a sale have been met.  *Sturgill v. Industrial Painting Corp. of Nevada*, 82 Nev. 61, 64, 410 P.2d 759, 761 (1966).  The conditions for the contemplated sale of condominium units to plaintiffs were not fulfilled here.  A condominium is an interest in real estate created by statute.   The interest does not exist until a statutory "declaration" is filed. *See* NRS 116.2101.  No declaration was filed by defendants.  Until the

SHIP PICKERING & PETERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101

1  declaration is filed, only the fee owners of the condominium *project* are the fee

2  owners of the units in the proposed condominium project. *See Jordan v.*

3  *Elizabethan Manor*, 593 P.2d 1049, 1053 (Mont. 1979); *State Savings & Loan*

4  *Association v. Kauaian Development Co.*, 445 P.2d 109, 116 (Haw. 1969).  In this case,

5  the *sole* fee owner, legal and equitable, is Krystle Towers.

6            Moreover, equitable conversion does not arise out of a contract

7  unless the contract is one that may be specifically enforced. *See Heider v. Dietz*,

8  380 P.2d 619, 623 (Or. 1963) (equitable conversion cannot be sustained unless the

9  contract is one that is specifically enforceable); *Holscher v. James*, 860 P.2d 646, 649

10  (Idaho 1993) (doctrine only applies if "nothing in the contract states otherwise");

11  *Parr-Richmond Indus. Corp. v. Boyd*, 272 P.2d 16, 22 (Cal. 1954) (there is "no

12  equitable conversion where the contracting parties demonstrate an intention to

13  the contrary").

14            Plaintiffs did not acquire a legal or an equitable interest in the

15  Krystle Towers property because (1) no declaration of condominium was filed for

16  Krystle Towers; and (2) the Condo Agreement which plaintiffs seek to "enforce"

17  expressly states that plaintiffs "have no equitable interest in the Unit" prior to

18  closing of escrow and recording of the deed.  Condo Agreement, Addendum B,

19  § 2.2.  Escrow could not close in the absence of a recorded statutory declaration of

20  condominium under NRS 116, because, until that event occurred, there would be

21  nothing to convey to plaintiffs.  Thus their reference to section 17 of the Condo

22  Agreement is meaningless:  The fact that the contract says a party to it has a

23  contractual right to pursue all legal remedies for breach or specific performance

24  does not establish breach or the facts for specific performance. *Yartzoff*, 809 F.2d

25  at 1374.  *If* Krystle Towers had obtained financing and *if* Krystle Towers had

26  recorded a declaration under NRS 116, and *if* plaintiffs had tendered their

27  purchase money in full, as the Condo Agreement stipulates, and Krystle Towers

28

MORRIS PICKERING & PETERSON
ATTORNEYS AT LAW
900 BANK OF AMER CA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS NEVADA 89101
(702)474-9400
FAX (702)474-9422

1    *then* refused to convey, the plaintiffs could state a claim for specific performance.

2    But these facts are not in this case, which means the claim for specific

3    performance here is bankrupt and should be so declared by the Court.

### I.    *A Claim for Intentional Interference with Contractual Relations Has Not Been Alleged Against Turnberry* .

5    Plaintiffs must allege the facts to establish *all* elements of their claim

6    for intentional interference with contractual relations. *Woods v. Reno*

7    *Commodities, Inc.*, 600 F. Supp. 574, 579 (D. Nev. 1984) (complaint must allege

8    facts to establish an interference motivated by a wrongful purpose). Two of the

9    most important elements of this claim are: (1) intentional acts intended or

10   designed to disrupt the contractual relationship; and (2) actual disruption of the

11   contract. *J.J. Indus., L.L.C. v. Bennett*, 119 Nev. 269, 71 P.3d 1264, 1266 (2003). Mere

12   knowledge of the existence of a contract is not enough. *See Bennett*, 119 Nev at

13   269, 71 P.3d at 1266 (plaintiffs must establish all five elements).

14   Here the plaintiffs have not pleaded *any* facts to support intentional

15   acts by Turnberry to disrupt their contractual relationship with Krystle Towers.

16   Alleging that Turnberry's knowledge of the contract is not enough to state the

17   claim. *See* Opp'n, pp. 26-27, and note 5.  Plaintiffs do not identify *what* it is

18   Turnberry did to disrupt the Condo Agreement and that Turnberry's acts —

19   whatever they may have been — "disrupted" the Agreement, particularly in the

20   face of admissions by the plaintiffs that the contract was subject to termination

21   for lack of sales *and* that there *was a lack of sales* to qualify Krystle Towers for

22   construction financing.

23   Plaintiffs' incomprehensible allegation that "Schinz, in conjunction

24   with Turnberry . . . *or alternatively*, with one of Roe Corporations I-X . . . *and/or*

25   others, engaged in intentional acts . . .,"  Compl., ¶ 74, is nothing but a desperate

26   plea to the Court to add a deep pocket to this already over-pleaded and infirm

27

28

MORR S.BIGALRINGHLPETERS'N
ATTORNEYS AT LAW
300. BANK OF AMERICA PLAZA
300. SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

case. If anything, Turnberry ensured performance of the contract — the plaintiffs got their money back, every cent of it, as the contract called for. This is the antithesis of "interference." The silly claim of interference should be assigned to the dustbin of judicial indifference. It should be dismissed.

## IV.  CONCLUSION

For the reasons set forth above and in the principal motion, all claims against Krystle Towers and Turnberry should be dismissed, with prejudice.

MORRIS PICKERING & PETERSON

By: _____
Steve Morris, No. 1543
Akke Levin, No. 9102
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

Attorneys for Defendants
Krystle Towers, LLC and
Turnberry/Las Vegas
Boulevard, L.P.

MORRIS PICKERING & PETERSON
ATTORNEYS AT LAW
BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

# CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I certify that I am an employee of MORRIS PICKERING & PETERSON, and I am familiar with the firm's practice of collection and processing documents for mailing; that in accordance therewith, I caused the following to be deposited with the U.S. Postal Service at Las Vegas, Nevada, in a sealed envelope, with first class postage prepaid, on the date and to the addressee(s) shown below. **REPLY IN SUPPORT OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT OF DEFENDANTS KRYSTLE TOWERS LLC AND TURNBERRY/LAS VEGAS BOULEVARD, L.P.**

TO:

| | |
|---|---|
| Will Kemp<br>J. Randall Jones<br>Jennifer Popick<br>HARRISON, KEMP & JONES, LLP<br>3800 Howard Hughes Pkwy., 17th Flr.<br>Las Vegas, Nevada 89109 | Mark A. James<br>James Hibbard<br>BULLIVANT, HOUSER, BAILEY, P.C.<br>3980 Howard Hughes Pkwy, Ste. 550<br>Las Vegas, Nevada 89109 |
| Attorneys for Plaintiffs | Attorneys for Plaintiffs |
| Ronald L. Warren<br>500 N. Rainbow Blvd., #100<br>Las Vegas, Nevada 89107 | Cam Ferenbach<br>Joice Nidy<br>LIONEL SAWYER & COLLINS<br>1700 Bank of America Plaza<br>300 South Fourth Street<br>Las Vegas, Nevada 89101 |
| Attorney for Fidelity National Title Agency of Nevada, Inc. | Attorneys for F.W. "Freddie" Schinz |

DATED this _2nd_ day of _August_ , 2005.

By _Brenda Valdez_

MORRIS PICKERING & PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 474-9400
FAX (702) 474-9422

## DECLARATION OF F.W. FREDDIE SCHINZ

I, F.W. "Freddie" Schinz, pursuant to 28 U.S.C. § 1746, declare the following:

1.    I am a resident of Florida.  Until March, 2005, I was the managing member of Krystle Towers, LLC ("Krystle Towers"), formerly known as Krystle Sands, LLC.

2.    In March 2004 Krystle Towers began marketing units in what was hoped would be the first residential high-rise condominium on the Las Vegas Strip (the "Project").  On March 18, 2004, the Nevada Real Estate Division granted permission to Krystle Towers to take reservations for condominium units in the contemplated Project.  That same month, Krystle Towers entered into an Exclusive Right of Sale Listing Agreement ("Listing Agreement") with Re/Max Benchmark Realty ("ReMax").  A copy of the Listing Agreement is attached at Tab 1. The Listing Agreement stipulates that ReMax will bear the costs of providing onsite sales facilities, advertising, and other marketing expenses. Tab 1, p. 1 ("Recitals").  Floor plans for the proposed units were available as early as March, 2004.  The sales brochures showed layouts of four different floor plans, the floor location, and the square footage of each model unit.  Over the course of time, ReMax suggested to Krystle Towers a number of luxury features for the units, such as ceiling fans and stainless steel refrigerators, most of which were agreed to.

3.    In or about June 2004 Krystle Towers began seeking construction financing from various lending institutions in Nevada and elsewhere with the help of a finance broker.  These efforts came to fruition on July 26, 2004, when Krystle Towers signed a conditional construction loan agreement ("Conditional Loan Agreement") with Hypo Real Estate Capital

Page 1 of 4

Corporation ("Hypo Bank") of New York. The Conditional Loan Agreement is attached at Tab 2. It contains an exclusivity clause that prohibits Krystle Towers from dealing with other lenders for construction financing. Tab 2, p. 12 ("Exclusivity"); *see also* p. 13 ("Disclaimer").

4.    431 units out of a total of approximately 588 units in the proposed Project were "reserved" through Reservation Agreements, which is 77% of the condominium units that were planned for the Project. The Reservation Agreements were non-binding; any money received to reserve a unit was refundable upon request. Substantially all of the reservations were taken by ReMax without the use of a model of the Project or a "virtual tour."

5.    Krystle Towers began preparations to offer condominium units for sale under a Purchase and Sale Agreement (PSA) following approval to do so from the State of Nevada on August 18, 2004.

6.    ReMax began presenting prospective purchasers with the PSA and other sales papers required by Nevada law in or before November 2004. It was anticipated that most, if not all, of the people who had signed Reservation Agreements would also enter into the PSA that has become the basis of this lawsuit, but they did not do so. If the number of PSA's had in fact equaled the number of Reservation Agreements, Krystle Towers would have met the requirements of the construction lender, Hypo Bank.

7.    170 Reservation holders converted to PSAs within several weeks of commencement of sales. Sales then slowed to a crawl. By December 17 there were only 181 PSAs, and as of the first of the following year, 2005, there were only 191 PSAs in place. At the same time, the real estate market in Las Vegas was volatile and competitors were announcing condominium projects that would compete with the Project. It was very disconcerting that there were

not sufficient sales to obtain construction financing under the Hypo Bank commitment.

      8.    I am informed and believe and thereupon allege that in or about February 24, 2005, a Hypo Bank representative visited the Krystle Towers sales office in Las Vegas.  At that time, there were sales of 223 units in Krystle Towers, far below the number required to obtain construction financing.

      9.    Prior to February 24, and prior to terminating the Project, Krystle Towers was forced to borrow money to pay ReMax commissions on the PSAs it had obtained for the Project.  ReMax was paid approximately $1,498,429.59 under its Listing Agreement with Krystle Towers.  By the end of February 2005, it was clear that Krystle Towers would not achieve sufficient pre-sales of units in the foreseeable future to satisfy the requirements of Hypo Bank to fund construction of the Project.  At the time the decision was made to terminate the Project, we had sales of approximately $133 million.  The Conditional Loan Agreement of Hypo Bank required pre-sales in the minimum amount of $229 million, Tab 2, leaving Krystle Towers short of approximately $100 million.

      10.    In March, 2005, Krystle Towers faced these economic realities, among others: (i) unproductive sales efforts; (ii) impending repayment of a $35 million loan from Fortress Capital for Krystle Towers' purchase of the real

Page 3 of 4

property for the Project, not including other charges; and (iii) interest accumulating on the Fortress Capital loan at a rate of approximately $16,000 per day.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 2 day of Aug, 2005.

_____

F.W. "Freddie" Schinz

## LISTING AGREEMENT

This Exclusive Right of Sale Listing Agreement (the "Agreement") is entered into as of the _____ day of _____, 2004, between **KRYSTLE SANDS, LLC**, a Florida limited liability company (the "Seller") and **RCRE, LLC**, a Nevada limited liability company **dba RE/MAX BENCHMARK REALTY** (the "Broker"), whereby the parties for Ten Dollars ($10.00) and other good and valuable consideration including the mutual covenants and agreements herein expressed, do agree as follows:

1. **RECITALS**. Seller is in the process of developing a condominium project in Las Vegas, Clark County, Nevada known as "Krystle Sands" (the "Project"). The Broker is in the business of selling condominium units. The Seller desires to retain the Broker, subject to the exclusions set forth herein, as the selling agent with the exclusive right to sell the individual residential condominium units in the Project (the "Units") at prices and terms acceptable to the Seller. Provided that the Broker is satisfactorily meeting the sales absorption schedule set forth herein, this Agreement shall be for a term beginning on the date of execution of this Agreement and ending on March 1, 2005 (the "Termination Date"). The Seller and Broker acknowledge that this Agreement does not guarantee a sale, but this Agreement does guarantee the best efforts of the Broker to sell the Units and grants the Seller the right to terminate this Agreement if the Broker has not met the sale absorption requirement set forth herein. The Broker will bear the costs of providing onsite sales facilities, advertising and other marketing expenses subject to the Seller's approval. If the Project does not go forward because (i) the Seller decides not to go forward even though the Project is otherwise feasible from a sales

1

and financial perspective or (ii) if the Seller sells the Project and the Broker is not retained as the broker for the Project, then in such event, the Seller will reimburse the Broker the sum set forth herein as liquidated damages.

2.      **AUTHORITY TO SELL PROPERTY**.  Subject to the limitations set forth below, Seller gives Broker the exclusive right to sell Units in the Project at the price and terms set forth on Exhibit "A" (the "Prices") beginning with the date of this Agreement and terminating on March 1, 2005, (the "Termination Date") unless earlier terminated pursuant to the Seller's rights to terminate set forth in Paragraph 9 titled "Sales Absorption Requirements".  The Units will be offered to any person without regard to race, color, religion, sex, handicap, familial status, national origin or any other factor protected by federal, state or local law.

3.      **THE PROJECT**.  The Project is described as Krystle Sands and is currently planned to include approximately 809 units and related amenities as determined by the Seller.  The Seller reserves the right to change the scope of the Project including increasing or decreasing the number of Units in the Project.

4.      **SELLER'S EXPENSES**.  The Seller will pay the cost of owner's title insurance coverage with regard to the sale of each Unit and one half of the escrow fee and the buyer of each Unit will be required to pay all other closing costs.  The Seller will prorate real property taxes.

5.      **BROKER'S OBLIGATIONS AND AUTHORITY**.  The Broker agrees to make diligent and continued efforts to sell the Project until all Units in the Project are sold.  The Seller authorizes the Broker to:

2

(a)     subject to the prior written approval of the Seller, advertise the Project in newspapers, publications, computer networks, including the internet and other media; place appropriate transaction signs on the Project;

(b)     provide objective comparative marketing analysis information to potential buyers;

(c)     withhold verbal offers;

(d)     the Broker shall act as a transaction broker and shall, promptly after receiving written notification from the Seller to do so, place the project in a multiple listing services (MLS).   Thereafter, Seller authorizes Broker to report to the MLS/Association of Realtors this listing information and price, terms and financing information on any resulting sale;

(e)     Broker, at Broker's sole costs, shall provide required printed marketing and sales materials and advertising acceptable to the Seller; and

(f)     Broker shall use only the reservation agreements, sales contracts, condominium documents and sales brochures that have been approved by the State of Nevada.

6.     **SELLER'S OBLIGATIONS**.   In consideration of Broker's obligations, Seller agrees to:

(a)     cooperate with Broker in carrying out the purpose of this Agreement, including, subject to the limitations set forth herein, referring immediately to Broker all inquiries regarding the Project;

(b)     to indemnify Broker and hold Broker harmless against losses,

3

damages, costs and expenses of any nature including attorney's fees, and from liability to any person, that Broker incurs (1) solely because of Seller's negligence, representations, misrepresentations, actions or inactions, (2) the existence of undisclosed material facts about the Project, or (3) a court or arbitration decision that a broker who was not compensated in connection with a transaction is entitled to the compensation from the Broker solely because of the negligence, action or inaction of the Seller. This clause shall survive Broker's performance and transfer of title.

(c)   to perform any act reasonable and necessary to comply with FIRPTA (Internal Revenue Code Section 1445);

(d)   make all legally required disclosures, including all facts that materially affect the Project's value and are not readily observable or known to a buyer;

(e)   consult appropriate professionals for related legal, tax, property condition, environmental, foreign reporting requirements and other specialized advice.

7.   **COMPENSATION**.  Seller will compensate Broker as specified below for procuring a buyer who is ready, willing and able to purchase a Unit in the Project on the terms of this Agreement as follows:

(a)   Six percent (6%) of the total purchase price of the Unit, such commission being payable as follows:

> Two percent (2%) upon Unit Contract execution;
> Two percent (2%) upon second deposit (top out); and
> Two percent (2%) upon close of escrow.

(b)   Fifty percent (50%) of all deposits that Seller retains as liquidated damages for a buyer's default; provided that the total payment to the Broker shall not

4

exceed six percent (6%) of the purchase price of the subject Unit.

8.    **CO-BROKERS**.  The Broker shall cooperate with other brokers, including buyer's agents, in selling Units in the Project and shall pay a minimum of three percent (3%) of the total six percent (6%) commission to any such co-broker who is involved in the sale of a Unit.

9.    **SALES ABSORPTION REQUIREMENTS**.  The Broker shall use its best efforts to meet the sales absorption requirements set forth on Exhibit "B" (the "Sales Requirement").  If the Broker fails to meet the Sales Requirement, the Seller may, in Seller's sole discretion, give notice in writing to the Broker that the Broker has failed to meet the Sales Requirement and that the Agreement will be terminated effective thirty (30) days from the date of the written notice unless the Broker has made additional sales and meets the Sales Requirement.  The termination of the Broker shall be without any liability of the Seller to the Broker of any nature whatsoever, except for commissions due and payable to the Broker on any sales made by the Broker during the term of this Agreement which are ultimately closed by the Seller.

10.    **EXCLUSIONS FROM THIS AGREEMENT**.  The Broker and the Seller agree that the Seller reserves the right to sell Units directly to a purchaser without using the Broker and, for such sales, the Seller shall have no obligation to pay Broker a commission.

11.    **UNIT SALES TO BROKER'S REPRESENTATIVES**.  The Seller agrees to sell one Unit each to Jeff Chain, Kristi Camadona and Cameron Yates (the "Broker's Representatives") with a minimal deposit of $1,000 per Unit.  All other Units purchased

by the Broker's Representatives shall require full deposits and be on the same terms and conditions as sales to other purchasers of Units.

12.   **MISCELLANEOUS**.  This Agreement constitutes the complete agreement of the parties and shall not be altered or amended except by an instrument reduced to writing and signed by the parties.  This Agreement shall be binding upon the parties, their successors and assigns.  This Agreement shall not be assigned by either party without the prior written consent of the other party.  This Agreement shall be construed according the laws of Nevada.

13.   **AGENCY RELATIONSHIP**.

(a)   Broker shall act as agent of the Seller and may also assign or designate a licensee of the Broker who shall act as the representative of the Seller in any resulting transaction.

(b)   Depending upon the circumstances, it may be necessary or appropriate for the assigned or designated licensee to act as agent for both Seller and Buyer, exchange parties, or one or more additional parties.  If applicable, Broker or the assigned or designated licensee shall disclose to Seller any election to act as a dual agent representing both Seller and Buyer and obtain the written Consent to Act Form signed by all parties to the transaction.

(c)   Broker may also have licensees in its company who are agents of the Buyer and who may show and negotiate an offer to purchase Seller's property.  In this event, the licensees that represent the Buyer will only represent the Buyer in the transaction with all fiduciary duties owed to the Buyer and not the Seller and this.

6

therefore, does not create a dual agency.

(d)   For each offer to purchase received, Seller shall execute a Nevada State Agency form and Acknowledgment of Agency and, if appropriate, a Consent to Act form.

14.   **SELLER'S REAL PROPERTY DISCLOSURE STATEMENT**.   Unless exempt under NRS chapter 113, Seller shall truthfully complete and sign a Seller's Real Property Disclosure Statement concerning the condition of the Property.

WHEREAS, the parties agree and hereto set their hands and seals the day and year first above written.

KRYSTLE SANDS, LLC,
a Florida limited liability company

By: F. W. (Freddie) Schinz
As Its Managing Member


RCRE, LLC,
a Nevada limited liability company
dba RE/MAX BENCHMARK REALTY

By: Jeff Chain
As Its Managing Member

7

EXHIBIT "A"

PRICES

EXHIBIT "B"

Sales Requirement

Reservation for 224 units required by 5/1/04.

Binding contracts for 405 units required within ninety (90) days after State of Nevada approved contracts first submitted to buyers.

Oct 22 04 05:08p    Jeff  hain          702-9.  5110          P. 2

Amendment to Exclusive Right of Sale Listing Agreement

The Exclusive Right of Sale Listing Agreement between Krystle Sands, LLC a Florida limited liability Company and RCRE LLC, a Nevada limited Liability company dba RE/MAX Benchmark Realty is hereby modified as follows;

Article 7. Compensation., Section a, is hereby amended as follows;

(a) Six Percent (6 %) of the total purchase price of the Unit, such commission being payable as follows:

One and One Half Percent (1 ½ %) of the total purchase price of the Unit will be paid within 20 days of the last day of the Buyer's recession period, following receipt and clearance of the initial ten percent (10%) deposit at Contract;

One and One Half Percent (1 ½ %) of the total purchase price of the Unit upon "Top Out"; and

Three percent (3%) upon Close of Escrow.

WHEREAS, the parties agree to modify and hereto set their hands and seals the day and year written below.

Krystle Sands, LLC
A Florida limited liability company

By: F. W. (Freddie) Schinz
As its Managing Member

RCRE, LLC,
a Nevada limited liability company
dba RE/MAX Benchmark Realty

By: Jeff Chain
As its Managing Member and Broker.

4/30/2004 9:11        KRYSTLE SANDS 2ND PHASE PRICING  ·  Effective 04/11/04

| Unit # | View | Type | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|--------|------|------|---|---|---|---|---|---|----|----|----|
| 14* | Pool/Hil | 2 | $529,900 | | $539,900 | | | | $554,900 | $554,500 | $559,900 |
| 12 | Pool/Hil | 1 | | | | | | $434,900 | | $444,900 | $449,900 |
| 10 | Pool/Hil | 1 | | | $429,900 | | $434,900 | | | $444,900 | $449,900 |
| 03 | Pool/Riv | 2 | $519,900 | $519,900 | $529,900 | | $534,900 | | | $544,900 | $549,900 |
| 05 | Pool/Riv | 2 | $519,900 | | $529,900 | | | | | | $549,900 |
| 07* | Pool/Riv | 2 | | $529,900 | $539,900 | $539,900 | $544,900 | $544,900 | | | |
| 17* | LVBlvd | 2 | $529,900 | | | | | | | | |
| 15 | LVBlvd | 1 | $419,900 | | | | | | | | $464,900 |
| 11 | LVBlvd | 1 | $419,900 | | $424,900 | | | | | | $464,900 |
| 09 | LVBlvd | 2 | $519,900 | | | | | | | | |
| 01* | LVBlvd | 2 | | | | | | | | | |
| 02 | T/North | 2 | $485,900 | $485,900 | $489,900 | | $501,900 | | | | |
| 04 | T/North | 2 | $485,900 | $485,900 | $489,900 | | $501,900 | $501,900 | $510,900 | $510,900 | $525,900 |
| 06 | T/North | 2 | $485,900 | $485,900 | $489,900 | $489,900 | $501,900 | $501,900 | $510,900 | $510,900 | $525,900 |
| 08* | T/North | 2 | $495,900 | $495,900 | $499,900 | $499,900 | $510,900 | $510,900 | $519,900 | $519,900 | $535,900 |

| Unit # | View | Type | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|--------|------|------|----|----|----|----|----|----|----|----|----|
| 14* | Pool/Hil | 2 | $579,900 | $579,900 | $584,900 | $584,900 | $589,900 | $589,900 | | $589,900 | $609,900 |
| 12 | Pool/Hil | 1 | $469,900 | $469,900 | $474,900 | $474,900 | $479,900 | $479,900 | $489,900 | $489,900 | $499,900 |
| 10 | Pool/Hil | 1 | $469,900 | $469,900 | $474,900 | $474,900 | $479,900 | $479,900 | $489,900 | $489,900 | $499,900 |
| 03 | Pool/Riv | 2 | $569,900 | $569,900 | $574,900 | $574,900 | $579,900 | $579,900 | | $589,900 | $599,900 |
| 05 | Pool/Riv | 2 | $569,900 | $569,900 | $574,900 | $574,900 | $575,900 | $579,900 | $589,900 | $589,900 | $599,900 |
| 07* | Pool/Riv | 2 | $579,900 | $579,900 | $584,900 | | | | | | |
| 17* | LVBlvd | 2 | | | | | | | | | |
| 15 | LVBlvd | 1 | $499,900 | $499,900 | $504,900 | | $509,900 | $509,900 | $519,900 | $519,900 | $529,900 |
| 11 | LVBlvd | 1 | $499,900 | $499,900 | $504,900 | | $509,900 | $509,900 | $519,900 | $519,900 | $529,900 |
| 09 | LVBlvd | 2 | | | | | | | | | |
| 01* | LVBlvd | 2 | | | | | | | | | |
| 02 | T/North | 2 | $555,900 | $555,900 | $564,900 | $564,900 | $569,900 | $569,900 | $579,900 | $579,900 | $589,900 |
| 04 | T/North | 2 | $555,900 | $555,900 | $564,900 | $564,900 | $569,900 | $569,900 | $579,900 | $579,900 | $589,900 |
| 06 | T/North | 2 | $555,900 | $555,900 | $564,900 | $564,900 | $569,900 | $569,900 | $579,900 | | $589,900 |
| 08* | T/North | 2 | $565,900 | $565,900 | $574,900 | $574,900 | $579,900 | $579,900 | | $589,900 | $595,900 |

| Unit # | View | Type | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|--------|------|------|----|----|----|----|----|----|----|----|----|
| 14* | Pool/Hil | 2 | | | | | | | | | |
| 12 | Pool/Hil | 1 | $504,900 | $509,900 | $509,900 | $514,900 | | $519,900 | $519,900 | $524,900 | $524,900 |
| 10 | Pool/Hil | 1 | $504,900 | $509,900 | $509,900 | $514,900 | $514,900 | $519,900 | $519,900 | $524,900 | $524,900 |
| 03 | Pool/Riv | 2 | $609,900 | $614,900 | $619,900 | $604,900 | | $609,900 | $609,900 | | $614,900 |
| 05 | Pool/Riv | 2 | $609,900 | $614,900 | $599,900 | $609,900 | | $609,900 | $609,900 | | |
| 07* | Pool/Riv | 2 | | | | | | | | | |
| 17* | LVBlvd | 2 | | | | | | | | | |
| 15 | LVBlvd | 1 | $529,900 | $534,900 | $544,900 | | | $554,900 | $554,900 | | |
| 11 | LVBlvd | 1 | $529,900 | $534,900 | $534,900 | $544,900 | | $554,900 | $554,900 | $564,900 | $564,900 |
| 09 | LVBlvd | 2 | | | | $564,900 | $624,900 | | | | |
| 01* | LVBlvd | 2 | | | | | | | | | |
| 02 | T/North | 2 | $599,900 | $599,900 | $599,900 | $604,900 | $604,900 | $609,900 | $609,900 | $614,900 | |
| 04 | T/North | 2 | $604,900 | $599,900 | $609,900 | $604,900 | $604,900 | $609,900 | $609,900 | $614,900 | $614,900 |
| 06 | T/North | 2 | $604,900 | $599,900 | $609,900 | $604,900 | $614,900 | $609,900 | $609,900 | $614,900 | $614,900 |
| 08* | T/North | 2 | $604,900 | $609,900 | $609,900 | $614,900 | $614,900 | $619,900 | $619,900 | | |

| Unit # | View | Type | 32 | 33 | | | 34 | 35 | 36 | 37 | 38 |
|--------|------|------|----|----|---|---|----|----|----|----|----|
| 14* | Pool/Hil | 2 | | | | | | | | | |
| 12 | Pool/Hil | 1 | $544,900 | $544,900 | | | $554,900 | $564,900 | $574,900 | $534,900 | $534,900 |
| 10 | Pool/Hil | 1 | $544,900 | $544,900 | | | | $564,900 | $574,900 | $534,900 | $534,900 |
| 03 | Pool/Riv | 2 | $525,900 | | | | | | $604,900 | | $654,900 |
| 05 | Pool/Riv | 2 | | | | | | | | | |
| 17* | LVBlvd | 2 | | | | | | | | | |
| 15 | LVBlvd | 1 | | | | | | | $599,900 | | $619,900 |
| 11 | LVBlvd | 1 | $564,900 | | | | | | $599,900 | $609,900 | |
| 09 | LVBlvd | 2 | | | | | | | | | |
| 01* | LVBlvd | 2 | | | | | | | | | |
| 02 | T/North | 2 | $529,900 | $529,900 | | | | | | $577,900 | $667,900 |
| 04 | T/North | 2 | $529,900 | $529,900 | | | $664,900 | $667,900 | $667,900 | $677,900 | $667,900 |
| 06 | T/North | 2 | | | | | | $667,900 | | | |
| 08* | T/North | 2 | $644,900 | $644,900 | | | | $667,900 | $667,900 | $667,900 | $667,900 |

Prices, building design, architectural renderings, floor plans, square footage, site plans, amenities, retail services, features and specifications are subject to change without notice. This offering is made only by the prospectus for the condominium and no statement should be relied upon if not made in the prospectus. This is not an offer to sell, or solicitation of offers to buy, the condominium units in states where such offer or solicitation cannot be made. THE NEVADA REAL ESTATE DEPARTMENT OF REAL ESTATE HAS NOT INSPECTED, EXAMINED, OR QUALIFIED THIS OFFERING.

JUL-26-2004 MON 12:52 PM COOPER HC    TZ    FAX NO. 2122970252    P. 04

Krystle Sands • Construction Loan

Hypo ▪ Real Estate
INTERNATIONAL

Krystle Sands
$255,000,000 Construction Loan (the "**Loan**")
Summary of Terms and Conditions

*July 26, 2004*

For Discussion Purposes Only

**I. PARTIES**

Sponsors:     F.W. Freddie Schinz, John T. Chain, Jr., Les W. Burke and J. Ron Rogers (collectively, the "**Sponsors**")

Borrower:     **Krystle Sands, LLC**, a single/special-purpose, bankruptcy remote limited liability company which is wholly owned and controlled by the Sponsors ("**Borrower**").

Agent:     Hypo Real Estate Capital Corporation ("**HRECC**") as agent for the Lenders ("**Agent**").

Lenders:     Agent and any other financial institutions selected by Agent. The financial institutions, including Agent, are collectively referred to as the "**Lenders**," and singularly as "**Lender**." Interests in the Loan may be sold, assigned and/or participated by Agent and each other Lender in whole or in part, with Agent consent.

**II. LOAN AMOUNT; PURPOSE; BORROWER EQUITY; CLOSING; DISBURSEMENTS**

Loan Amount:     The "**Loan Amount**" shall be an amount equal to the lesser of (a) $255,000,000; (b) 70% of the sum of (i) the estimated net sales proceeds of the Condominium Portion, and (ii) the appraised stabilized value of the Retail Portion (as defined below), as determined pursuant to the Appraisal (as defined below); or (c) 85% of the Project Cost Budget (defined below). Only for the purpose of calculating the loan to value ratio, $4,000,000 of assumed leasing commissions for the retail space shall be added to the Loan Amount. The Loan Amount shall not be increased to include such amount.

"**Appraisal**" is a FIRREA appraisal of the Property commissioned by Agent, at Borrower's sole cost and expense, performed by a MAI appraiser approved by Agent and otherwise acceptable to Agent in all respects.

Purpose:     To finance a portion of the costs to acquire, construct and sell a 45-story, mixed-use property located at 2845 Las Vegas Boulevard South, Las Vegas, NV, consisting of approximately 600 hotel/condominium units comprising an approximately 623,080 net sellable square feet, excluding balconies (the "**Condominium Portion**"), approximately 70,000 square feet restaurant and retail space (the "**Retail Portion**"), and a 10-story

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member



JUL-26-2004 MON 12:52 PM COOPER 1 MTZ                    FAX NO. 2122971025                       P. 02

Krystle Sands • Construction Loan

**Hypo ◼ Real Estate**
INTERNATIONAL

parking garage with approximately 1,069 spaces. The property will offer a wide range of amenities such as balcony for each hotel/condominium unit, pool and spa, fitness facilities and small meeting/ convention rooms (collectively, the "**Property**").

**Borrower Equity:** The greater of (i) $45,000,000 and (ii) the amount by which the Project Cost Budget exceeds the Loan Amount ("**Borrower Equity**") will be fully contributed in cash by Borrower prior to initial funding by Lender. Agent shall be provided with evidence acceptable to Agent of the contribution of the Borrower Equity.

The Borrower and Fortress Credit Corporation ("Fortress") are contributing a total of $45,000,000 to the Property as Borrower Equity. Fortress' contribution will take the form of a mezzanine loan or preferred equity investment (subject to satisfactory intercreditor agreement) to/in an entity (the "**Mezzanine Borrower**") which shall own and assign its 100% interest in the Borrower as collateral for such mezzanine loan or preferred equity investment.

**Loan Disbursements:** Agent shall disburse funds no more frequently than once every thirty (30) days in accordance with Agent's standard construction disbursement procedures.

Initial funding will occur only after the achievement of Net Pre-Sales (as defined below) in the minimum amount of $229,500,000 based upon an average sales price of not less than $560 per net saleable square foot ("**Minimum Net Pre-Sales**").

"**Net Pre-Sales**" is defined as the sum of 97.0% of the aggregate purchase prices stipulated in Qualifying Contracts (as hereinafter defined).

**Anticipated Closing Date:** September 2004

### III. INTEREST; PAYMENT; FEES

**Interest Rate:** At the Borrower's election, the Loan shall bear interest at a floating rate as described below:

(a) "**Adjusted LIBOR Rate**": LIBOR + 3.00% (the "**LIBOR Margin**") per annum; or

(b) "**Adjusted Base Rate**": Agent's Base Rate + 2.25% (the "**Base Rate Margin**") per annum.

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member



JUL-26-2004 MON 12:52 PM COOPER HOROWITZ          FAX NO. 2122970252          P. 06

Krystle Sands • Construction Loan


Hypo ■ Real Estate
INTERNATIONAL

LIBOR shall be at 1, 2, 3, 6 and 12 month terms (subject to availability and a maximum of three (3) contracts outstanding at any time)

The rate quoted as LIBOR may be increased for any reserve requirements prescribed or incurred (whether directly, indirectly or on a portfolio-wide basis). LIBOR is the average rate of interest per annum, rounded upward to the nearest whole multiple of one hundredth of one percent (0.01%) of interbank offered rates for dollar deposits in the London Interbank market as set forth on Bloomberg Screen, code BBAM, meanining the "British Bankers Association LIBOR Rates code" on the monitor of the money rates of the Bloomberg service or any successor code as may replace code BBAM in said service for the purposes of display of the interbank interest rates offered on the London market (London Interbank Offered Rates – LIBOR) at approximately 11:00 a.m. (London time) two LIBOR Business Days before the first day of the applicable Interest period for a period of time comparable to the applicable interest period. In addition, the Loan Documents will contain Agent's customary provisions relating to increased costs, capital adequacy protection, withholding and other taxes and illegality.

"**Base Rate**" on any day means the higher of (i) the Prime Rate (as defined below) in effect on that day, and (ii) the sum of (A) the "Federal Funds Rate" in effect on that day as announced by the Federal Reserve Bank of New York, plus (B) 0.5%.

"**Prime Rate**" is the rate announced from time to time by Hypo Real Estate Bank International as its prime rate for US loans.

**Interest Payments:**

Interest Payments are due monthly in arrears on the first business day of the month (the "**Payment Date**"). All interest and fees will be computed on an actual/360 basis.

**Principal Amortization:**

None; other than Release Price Payments (as defined below)

**Prepayment:**

Borrower may at any time, upon thirty (30) business days' written notice, prepay without penalty or premium any portion of the Loan in increments of not less than $1,000,000, with proceeds other than from units sales, subject to the payment of a fee of 1.00% (the "**Prepayment Fees**"). There shall be no Prepayment Fees associated with Release Price Payments.

All prepayments, other than Release Price Payments, shall include all accrued and unpaid interest to and including the date of prepayment on the amount being prepaid; All prepayments shall be subject to Borrower's payment of any and all breakage costs, losses and expenses incurred by the Lenders.

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

JUL-26-2004 MON 12:53 PM COOPER HOROWITZ          FAX NO. 212297025.          P. 07

Krystle Sands • Construction Loan

# Hypo ▪ Real Estate
### INTERNATIONAL

| | |
|---|---|
| **Interest Rate Protection:** | As a condition precedent to the closing of the Loan, Borrower will be required to enter into an interest rate cap, collar or other acceptable derivative for the Term (as defined below) with Agent or another institution acceptable to Agent for 100% of the outstanding Loan Amount based on Borrower's projected draw schedule for the Term of the Loan, which shall be acceptable to Agent, at an all-in interest rate (inclusive of the LIBOR Margin) of 7.00% per annum (an "**Interest Rate Protection Agreement**").  The form, substance, counterparty and all other aspects of the Interest Rate Protection Agreement shall be acceptable to Agent. The Interest Rate Protection Agreement may not be secured by a lien on the Property unless Agent or an affiliate of Agent is the counterparty. |
| **Default Rate:** | 5% in excess of the interest rate then in effect (i.e. Adjusted LIBOR Rate and Adjusted Base Rate).  In addition, a late payment charge of 5% of the amount due shall be payable to Agent if any payments due under the Loan are not paid on the due date |
| **Fees:** | |
| **Upfront Fee:** | Borrower shall pay Agent a fee equal to 1.3725% of the Loan Amount upon the closing. |
| **Administration Fee:** | An Administration Fee of $90,000 per annum during the Term shall payable in equal monthly installments in advance on each Payment Date. |

## IV. TERM

| | |
|---|---|
| **Loan Term:** | 36 months from the date of the closing of the Loan (the "**Term**"). |

## V. COLLATERAL

| | |
|---|---|
| **Guarantors:** | The Sponsors, subject to satisfactory review of detailed financial information by Agent. |
| **Guaranties:** | Guarantors shall provide the following guaranties (the "**Guaranties**"): |

**Guaranty of Non-Recourse Exclusions:** Guaranty of the Non-Recourse Exclusions in the Loan Documents.  "Springing" principal guaranty in case of voluntary or collusive involuntary bankruptcy.

**Environmental Indemnification:** Borrower and Guarantors shall indemnify Lenders from any costs, claims or liabilities associated with any adverse environmental conditions at the Property, including the presence or removal of any hazardous wastes and toxic materials now or hereafter existing on the Property or being in the possession of the Borrower.  The indemnity (the "**Environmental Indemnity**") will survive repayment

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

---

Hypo Real Estate Capital Corporation      **Page 4 of 14  07/26/04  TS Krystle Sands revised 07-26-04** rest

JUL-26-2004 MON 12:53 PM COOPER HUROWTZ          FAX NO. 212297025_                P. 08

Krystle Sands • Construction Loan



Hypo ▢ Real Estate
INTERNATIONAL

of the Loan.  The Environmental Indemnity shall be in form and substance acceptable to Agent.

**Completion Guaranty:** Lien free, timely completion of the construction of the Property including the funding of all Project Costs, both hard and soft, in excess of the approved Loan Budget.

**Interest and Operating Deficit Guaranty:** Payment of interest and operating costs through repayment of the Loan

**Recourse:**

Without limiting obligations under the Guaranties, the Loan shall be non-recourse to the Borrower except for Agent's customary non-recourse exclusions (the "<u>Non-Recourse Exclusions</u>").

**Security Documents:**

The Loan will be secured by (i) a first priority mortgage or deed of trust on the fee interest in the Property ("<u>Mortgage</u>"); (ii) assignment of all leases, letter of credits, rents, security deposits and profits generated therefrom; (iii) assignment of interest in operating accounts and collateral accounts maintained for reserves; (iv) security agreements and UCC-1 financing statements, all personal property and fixtures used in connection with or installed at the Property; (v) assignments of all contracts and agreements associated with the construction, design, ownership and operation of the Property, including, without limitation, permits, licenses, operating agreements, management contracts, approvals, services contracts, plans and specifications, brokerage and leasing agreements, architect's agreements and construction contracts; (vi) collateral assignment of Interest Rate Protection Agreement; (vii) consents of the counterparty to Interest Rate Protection Agreements; (viii) collateral assignment of all unit sales contracts; and (ix) other customary security requirements (including, without limitation, title insurance) for transactions of this nature deemed necessary by Agent and its counsel (all of the foregoing, the "<u>Security Documents</u>").

**Security Deposits:**

All cash security deposits held by Borrower under condominium unit purchase and sale agreements shall be deposited with HRECC or such other institution HRECC may designate

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

JUL-26-2004  16:10                                                           P.03
Krystle Sands • Construction Loan

## Hypo ■ Real Estate
INTERNATIONAL

## VI.  LTV; DSCR;  CASH MANAGEMENT; FINANCIAL COVENANTS; REPORTING

**Financial Covenants of
Guarantors:**                TBD

**Reporting Requirements:**   Borrower and Guarantors shall furnish to the Agent the following
information certified by a responsible officer of Borrower and/or
Guarantors, as applicable:

   a.  Monthly sales status report and marketing summaries for
the Property, within 10 days after each month-end

   b.  Annual     audited     financial     statements     of     the
Borrower/Property within 90 days after each year-end,
including (a certificate of the Borrower's accountants, )
Annual financial statements of each Guarantor, which shall
be certified by an independent certified public accountant, *Annual*
within 90 days after each year-end.

   c.  Certificate of covenant compliance by the Guarantors due
30 days after each ~~quarter~~ end. *year*

   d.  Quarterly   unaudited   financial   statements   for   the
Borrower/Property ~~and each Guarantor~~ within 30 days after
quarter end.

   e.  Annual pro-forma budget for the Property due 30 days
before year-end

   f.   Such other information as the Agent may reasonably
require.

All financial information required to be submitted by Borrower to
Agent shall be prepared in accordance with generally accepted
accounting principles, consistently applied.    Audited financial
statements shall be prepared by an ~~other~~ independent certified
public accounting firm acceptable to Agent.  Financial statements
shall include detailed balance sheet, income statement, cash flow
statement and contingent liability schedule.  Guarantors who are
individuals, and Borrower shall additionally submit to Agent a copy
of their respective federal income tax returns within 30 days of
filing.

Agent reserves the right to distribute to Lenders all financial
information submitted by Borrower and Guarantors. as well as
tenants.

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member



JUL-26-2004  16:10                                                                      P.23

Krystle Sands • Construction Loan

**Hypo ▮Real Estate**
INTERNATIONAL

VII.   ADDITIONAL COVENANTS; DEFAULTS

Leasing:      For the Retail Portion, Borrower shall be entitled to
enter into new leases which are not Major Leases (as defined
below) without Agent's prior review as long as such leases are
prepared on Borrower's standard form of lease approved by Agent
(provided that such lease is subordinate to the Mortgage and the
Loan) and comply with leasing parameters as follows: (a) minimum
annual base rent excluding reimbursements (i.e., on a NNN basis)
during any year of the lease term shall not be less than $100 per
NRSF, (b) a maximum leasing commission and tenant
improvement allowance of $100 per NRSF, and (c) a minimum
lease term of 10 years (the "**Leasing Parameters**").  Borrower
must notify Agent of any such lease prior to the lease being
executed.  Borrower shall deliver a copy of each fully executed
lease (and modification) and an abstract of same to Agent,
regardless of whether Agent's consent is required.

*(for CVS; all
other shall not
be less than
$50 per NRSF)*

Agent shall reserve the right to approve all leases in excess of
7,000 net rentable square feet ("**NRSF**" and each such lease, a
"**Major Lease**"), which approval shall not be unreasonably withheld
if the proposed tenant is creditworthy ~~(as determined by Agent in
its reasonable discretion)~~ and such lease complies with, or
exceeds the Leasing Parameters.   Agent shall execute a
subordination and nondisturbance agreement ("**SNDA**") in form
and substance acceptable to Agent for each Major Lease which is
approved by Agent.  All of Agent's fees and costs of review of
Leases (and modifications) and preparation of consents and
SNDA's shall be paid by Borrower.

Krystle Sands, LLC.
F. W. "Freddie" Schinz, Managing Member

TOTAL P.23

JUL-26-2004 MON 12:54 PM COOPER HOROWITZ          FAX NO. 212297025          P. 11

Krystle Sands • Construction Loan

## Hypo ■ Real Estate
#### INTERNATIONAL

| | |
|---|---|
| **Unit Sales Contracts:** | All Unit Sales Contracts shall be on Borrower's standard form of sales contract as approved by Agent on or before closing. Each Unit Sales Contract shall be (i) executed by third party purchaser, (ii) require a Minimum Non-Refundable Deposit payable in two installments (as defined below) which shall be deposited with a depository selected by Agent, (iii) provide for a purchase price which shall support the **"Minimum Release Price"** for the applicable unit as mutually agreed upon by Borrower and Agent prior to Loan closing and which shall average not less than $560 per net sellable square foot, and (iv) have no contingencies other than completion of construction (each such sales contract , a **"Qualifying Contract"**) |
| | As a condition to the release of an individual condominium unit from the lien of the Mortgage, Borrower shall pay to Agent the greater of (a) 97.0% of the purchase price, (b) the Minimum Release Price for such unit and (c) the actual net sale proceeds from the sale of the unit (the **"Release Price Payment"**) |
| | The **Minimum Non-Refundable Deposit** shall equal 20% of the purchase price, payable in two installments, 10% upon contract execution and 10% upon commencement of construction. |
| **Transfer of Interest:** | Borrower and its members shall not: (a) sell, assign or otherwise transfer, directly or indirectly, the Property or any portion thereof or any interest therein; or (b) permit any direct or indirect change in the ownership of the Borrower or any of its partners or members without the prior written approval of Agent, which approval may be withheld by Agent in its discretion. |
| **Management:** | The Property shall be managed by a manager approved by Agent pursuant to a property management agreement reasonably acceptable to Agent. The property management agreement shall be assigned to Agent and shall be subordinate to the Loan Documents |
| **Miscellaneous Covenants:** | The Loan documents shall contain those negative and affirmative covenants which Agent deems appropriate in a transaction of this nature. |
| **Completion Date:** | Borrower shall "substantially complete" the Property in accordance with approved plans and specifications on or before March 2007 |
| **Events of Default:** | Agent's customary, with its customary notice and cure rights. |

Krystle Sands, LLC
F W "Freddie" Schinz, Managing Member

JUL-26-2004 MON 12:54 PM COOPER HOROWTZ          FAX NO. 21229702.          P. 12

Krystle Sands • Construction Loan

**Hypo ⊞ Real Estate**
INTERNATIONAL

VIII.   CONDITIONS

**Loan Documentation:**

The Loan will be subject to preparation, execution, and delivery of a loan agreement, promissory note(s) and such other loan documents including, without limitation, the Guaranties and the Security Documents satisfactory to Agent and its counsel (the "**Loan Documents**").

The Agent will enter into an Intercreditor Agreement with Fortress, the provider of the mezzanine loan or preferred equity investment

Such documents will contain conditions to borrowing, representations and warranties, covenants, events of default, indemnification, payment of expenses, agency, and other provisions which shall be satisfactory to Agent.

**Appraisal:**

Prior to closing the Loan, Agent shall order, receive and approve an Appraisal of the Property.

**Environmental Assessment:**

Borrower will pay for a Phase I Environmental Assessment, and a Phase II Assessment, (each , an "**Environmental Assessment**") and all subsequent reports, if any, performed by a consultant selected by Agent (the "**Environmental Consultant**"). The Phase I report will be performed in accordance with ASTM Standard 1527-00  The Loan shall not close In the event any adverse environmental conditions are identified by the Environmental Consultant and are not remedied by the Borrower to the Agent's satisfaction.

**Insurance Review:**

Borrower will be required to maintain certificates and policies evidencing casualty insurance against loss customarily included under "all risk" policies, including, without limitation, flood, earthquake and acts of terrorism at full replacement cost (including business/rental interruption Insurance for a minimum period of one year upon substantial completion of the Property), "builder's risk" and liability insurance, which shall be satisfactory to Agent and its consultant ("**Insurance Consultant**").   Where applicable, Agent shall be named as mortgagee, loss payee and additional insured.

All insurance certificates and policies shall be reviewed and approved by the Insurance Consultant designated by Agent prior to the closing of the Loan  The cost of all such reviews shall be paid by Borrower.

**Title Insurance/ Survey:**

Borrower shall obtain, at its expense, (i) title insurance insuring Agent's Mortgage and (ii) an ALTA property survey ("**Survey**") of the Property, In each case acceptable to Agent.

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

JUL-26-2004 MON 12:54 PM COOPER HUROWTZ        FAX NO. 21229704..        P. 13

Krystle Sands • Construction Loan

**Hypo ▪ Real Estate**
INTERNATIONAL

**Bonding and Contracts:**

The general contract shall be a Guaranteed Maximum Price contract ("**GMP**") which shall be subject to the review and approval of Agent. The general contractor shall be acceptable to Agent. The GMP and all construction contracts and subcontracts having a value in excess of $500,000 ("**Major Contracts**") must be bonded by insurers acceptable to Agent. These bonds, as well as fully executed contracts from all subcontractors, must be delivered to Agent and Construction Consultant prior to any disbursement of any portion of the Loan in respect of the any amounts due under such contracts. Major Contracts, as defined above, shall be subject to the review and approval of Agent.

**Project Cost/ Budget Review:**

A budget, which details all direct and indirect costs estimated to be incurred until the Retail Portion achieves stabilized occupancy and the Condominium Portion is fully sold out (the "**Project Cost Budget**"), shall be prepared by Borrower and delivered to Agent and to a consultant selected by Agent (the "**Construction Consultant**"). In addition to the Project Cost Budget, Borrower shall deliver for review by Construction Consultant all of the building plans, specifications, contracts, subcontracts, schedules, tests, and all other reports required by the Construction Consultant (the "**Construction Documents**"). The Construction Consultant shall prepare a report for Agent that documents the Construction Consultant's review conclusions (the "**Preliminary Project Report**"). After reviewing the Preliminary Project Report, Agent shall specify a detailed budget for the Loan (the "**Loan Budget**"). Each category of direct and indirect cost (the "**Line Items**") in the Project Cost Budget which is to be funded from Loan proceeds, including all budget contingencies, shall be delineated in the Loan Budget. Re-allocations between Line Items and material project plan changes are subject to approval by Agent, which shall not be unreasonably withheld. Borrower and Guarantor shall be required to fund Line Item shortfalls (i.e., cost overruns). The Construction Consultant shall perform ongoing review services to Agent with respect to construction and the Project Cost Budget and all ongoing expenses of the Construction Consultant during construction shall be paid by Borrower.



Krystle Sands LLC
F.W. "Freddie" Schinz, Managing Member

JUL-26-2004 MON 12:55 PM COOPER . ,ROWTZ            FAX NO. 21229702            P. 14

Krystle Sands • Construction Loan

**Hypo ⬛Real Estate**
INTERNATIONAL

**Additional Conditions to Closing:**

Agent's usual and customary conditions for transactions of this nature, including but not limited to, (i) completion and approval by Agent in its sole discretion of its underwriting of the transaction and the entities involved in the transaction; (ii) satisfactory lien searches and judgment searches; (iii) delivery of a sales report, certified by Borrower, in form and substance satisfactory to Agent; (iv) review and approval of all contracts (including management agreements), (v) evidence satisfactory to Agent that the Borrower has filed and obtained an exemption under the Nevada law to build and sell the Project pursuant to the timetable permitted by the Federal Government, which provides for a deadline for delivery of units which is five years from date of Loan closing, (vi) Agent shall have received Qualifying Contracts representing the Minimum Net Pre-Sales, (vii) contract deposits for the Net Pre-Sales shall be deposited pursuant to the terms of this Construction Loan; (viii) the Qualifying Contracts provide for sufficient time, in the judgment of Agent, for Borrower to complete the Improvements and deliver the units, and (ix) such other items that Agent customarily requires, including, but not limited to, legal opinions, borrower certificates, organizational documents, insurance certificates, licenses and permits.

**IX. MISCELLANEOUS**

**Transaction Costs:**

Whether or not the transaction contemplated herein closes, Borrower and Sponsor will pay all reasonable out-of-pocket fees, costs and expenses incurred by Agent in connection with the proposed transaction prior to, coincidental with and following the closing of the Loan, including, but not limited to, legal, appraisal, engineering, environmental, insurance premiums (including title insurance), site inspection, recording fees and charges (including, without limitation, mortgage tax) and costs incurred by Agent in reviewing due diligence materials, including all consultant fees and expenses (the "**Agent's Expenses**").

**Good Faith Deposit:**

In the event Borrower desires Agent to seek the necessary internal credit approvals for the Loan, Sponsor and Borrower must execute a counterpart of this Summary of Terms and Conditions where indicated below and return the same, together with good and funds in the amount of $200,000 (the "**Good Faith Deposit**") within five (5) days of the date which appears on page 1 of this Summary of Terms and Conditions. The obligation to deliver the Good Faith Deposit is separate from and in addition to Sponsor's and Borrower's obligation to pay Agent's Expenses. If the Loan shall close, the Good Faith Deposit shall be credited against the Upfront Fee. If the Loan shall fail to close solely as a result of the failure of Agent to obtain all necessary internal credit approvals, the Good Faith Deposit, less any unreimbursed Agent's Expenses shall be refunded to Borrower. If the Loan shall fail to close upon the terms and conditions set forth herein for any other reason,

Krystle Sands, LLC
F. W "Freddie" Schinz, Managing Member

Krystle Sands • Construction Loan

Hypo ▦ Real Estate
INTERNATIONAL

**Retail Refinancing:**

Agent shall be entitled to retain the excess balance of the Good Faith Deposit. Nothing contained in this paragraph shall limit in any way the liability of Borrower and Sponsors to pay to Agent upon demand all Agent's Expenses, whether or not in excess of the Good Faith Deposit.

Borrower and Sponsor acknowledge that a material inducement to Agent to provide this Term Sheet is that Agent shall have the option and the right (should Agent elect in its sole and absolute discretion), to provide the refinancing with respect to the Retail Portion of the proposed project on the Property (the "**Retail Refinancing**"). Accordingly, Borrower and Sponsor agree that prior to discussing or otherwise seeking any Retail Refinancing, Sponsor and Borrower will in good faith enter into discussions with Agent to arrive at an arrangement pursuant to which Agent and any Lenders designated by Agent will provide the Retail Refinancing. In the event that Agent declines to provide the Retail Refinancing or despite the foregoing discussions, Agent and Sponsor and Borrower do not arrive at a mutually acceptable agreement as to the terms and provisions of the Retail Refinancing, upon notice to Agent, Sponsor and Borrower will be permitted to seek Retail Refinancing from third parties ("**Third Party Retail Refinancing**"). Sponsor's and Borrower's right to obtain Third Party Retail Refinancing is subject to Agent's subsequent right of first refusal to provide the Retail Refinancing as described below. In amplification of the foregoing, prior to Sponsor and Borrower entering into any definitive letter of intent, term sheet or other agreement which sets forth in reasonable detail the terms of any Third Party Retail Refinancing (and without regard to the binding nature thereof), Sponsor and Borrower will provide a copy of the proposed letter of intent, term sheet or other agreement to Agent. Should Agent elect by notice given to Borrower and Sponsor within ten (10) business days of Agent's receipt of the proposed letter of intent, term sheet or other agreement to provide the Retail Refinancing set forth therein, Agent and Sponsor and Borrower shall enter into an agreement pursuant to which Sponsor and Borrower shall procure the Retail Refinancing from Agent and Lenders selected by Agent substantially on the terms set forth in the proposed agreement, with such modifications as to which Agent and Sponsor and Borrower shall mutually agree.

**Exclusivity:**

Until the transaction proposed herein is consummated or a determination is made by Agent not to pursue such transaction, Sponsor and Borrower hereby agree to deal exclusively with Agent in respect of the financing herein contemplated and not to obtain or attempt to obtain from any other party the Loan or any other financing in respect of the Property. Sponsors and Borrower hereby agree that should Borrower, Sponsors or any affiliate of Borrower or Sponsors close any loan secured by the Property in violation of the preceding sentence, then, in addition to any other rights and remedies available to Agent at law or in equity,

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

Case 2:05-cv-00829-BES -GWF   Document 14-2787939   Filed 08/03/05   Page 48 of 49

Krystle Sands • Construction Loan



Borrower and Sponsors shall immediately pay to Agent concurrently with the closing of such loan, a break-up fee in the amount of $2,400,000, less any unused amount of the Good Faith Deposit (the "**Break-Up Fee**") as liquidated damages, it being acknowledged and agreed by the parties hereto that such liquidated damages are intended to compensate Agent for added administrative time and costs incurred, lost opportunity costs and damages sustained by Agent as a result of Borrower's election not to close the Loan.

Notwithstanding the foregoing, the Break-Up Fee shall not be applicable if Agent does not receive approval from its Board of Directors for this transaction within 30 days from the date the Agent receives a copy of this Summary of Terms and conditions executed by Sponsor, provided Borrower and Sponsor have theretofore submitted all information requested by Agent and contemplated in this Summary of Terms and Conditions

**Disclaimer:**

This Summary of Terms and Conditions was prepared based upon representations made by and information provided by the Sponsor, Borrower, Guarantors and their principals and/or agents.

This Summary of Terms and Conditions is presented for discussion purposes only and shall not be construed as a commitment by Agent to make the Loan (or any other loan) to Borrower upon the terms and conditions herein set forth or upon any other terms or conditions. Except for the obligations of Agent, Borrower and Sponsor under the Paragraphs captioned "Transaction Costs", "Exclusivity" and "Good Faith Deposit", this Summary of Terms and Conditions imposes no obligations upon any party hereto and either party may terminate discussions at any time for any reason or no reason, without notice and without liability except as provided in the Paragraphs captioned "Transaction Costs", "Exclusivity" and "Good Faith Deposit" above

**Governing Law:**

This Statement of Terms and Conditions shall be governed by New York law

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

JUL-26-2004 MON 12:56 PM COOPER I   WTZ          FAX NO. 212291025

Krystle Sands • Construction Loan

## Hypo ▣ Real Estate
INTERNATIONAL

The parties acknowledge that a commitment shall be subject to approval by Agent's Board of Directors, among other conditions

### HYPO REAL ESTATE CAPITAL CORPORATION

Name: 
Title: **ROBERT DOWLING**
**MANAGING DIRECTOR**

Name: 
Title: **Stephan van de Loecht**
**Director**

Acknowledged and agreed this  26  day of JULY , 2004

Applicant / Sponsor:

Krystle Sands, LLC
F. W. "Freddie" Schinz, Managing Member

by: _____
(signature)

Krystle Sands, LLC

Name: ___F. W. "Freddie" Schinz, Managing Member

Title: _____

Krystle Sands, LLC
F. W "Freddie" Schinz, Managing Member